843 So.2d 1186 (2003)
L.S. HUCKABAY, M.D. MEMORIAL HOSPITAL, INC., Plaintiff-Appellee,
v.
KPMG PEAT MARWICK, LLP, Donald H. LeBlanc, Jr., and J. Mark Garrett, Defendants-Appellants.
No. 36,775-CA.
Court of Appeal of Louisiana, Second Circuit.
April 9, 2003.
*1188 John Gregory Odom, Joseph Payne Williams, Metairie, Stuart E. DesRoches, CHarles Ferrier Zimmer II, for Appellants.
James Guenard Bethard, Coushatta, for Appellee.
Before BROWN, DREW and KOSTELKA (Pro Tempore), JJ.
DREW, J.
KPMG Peat Marwick, LLP, J. Mark Garrett, and Donald H. LeBlanc, Jr. (collectively referred to as "KPMG") were sued after failing to recover the maximum Medicaid Disproportionate Share ("DSH") payment for which L.S. Huckabay M.D. Memorial Hospital ("Hospital") was eligible. The trial court found in favor of the Hospital and awarded $439,712.15, the amount paid by the Hospital to consultants to recover the maximum DSH reimbursement, and $141,903.55 in damages suffered by the Hospital due to its temporary loss of the use of the DSH funds. Due to lack of evidentiary support, we amend the judgment to delete the award for loss of use of the funds. In all other respects, the judgment, as amended, is affirmed.

FACTS
Dr. Jackie Huckabay and Dr. Fred Willis are the owners of the Hospital, which is located in Red River Parish. In the early 1990s, Dr. Huckabay and Dr. Willis considered selling the Hospital, and they thought they would need audited financial statements in order to do this. Judy Durham, the Hospital's Administrator at the time under a management agreement with Schumpert Hospital, encouraged them to hire the accounting firm KPMG to perform the audit.
By letter dated October 22, 1992, KPMG confirmed its engagement to perform an audit of the Hospital's financial statements for the fiscal year ending September 30, 1992. This letter detailed the scope of the audit services, as well as an estimate of the audit fees. Listed among the estimated audit fees was $4,000 for a cost report to be filed with the Louisiana Department of Health and Hospitals. Cost reports are utilized by health care providers to receive reimbursement for providing health care services to the poor. One aspect of the cost reports at issue is Disproportionate Share, which is an additional reimbursement payment to a qualifying hospital for treating a disproportionate share of low-income patients. KPMG ultimately sought $256,157 in DSH reimbursement for the Hospital for 1992.
On March 16, 1993, KPMG faxed to Durham a bill listing an additional charge of $8,000 regarding the preparation of the 1992 cost report. Included with this fax was a letter from J. Mark Garrett to Durham in which he stated, "[W]e are ready to assist you in filing an amended 1991 cost report to get as much as possible in reimbursements for this period." Amending the 1991 cost report resulted in an additional reimbursement of $121,867 to the Hospital.
*1189 The estimated cost for preparing the cost report for fiscal year 1993 was $6,000. Once again, this charge was listed under "Audit Fees" in a July 1993 engagement letter that was similar to the 1992 letter. KPMG sought a 1993 DSH payment of $38,542 for the Hospital.
James Bohl, an administrator of another local hospital, expressed an interest in purchasing the Hospital. Bohl asked Michael McKay to assist him in examining the Hospital's operations to determine if it was feasible to purchase the Hospital. Bohl and McKay then approached the Hospital with an offer to review the cost reports filed by KPMG to see if they could recover any additional reimbursement.
An independent contractor agreement between McKay and the Hospital was executed in May of 1994. The agreement provided that McKay would receive 20% of any past reimbursement adjustments received by the Hospital due to McKay's efforts on cost reports that had been filed prior to 1994. If McKay's efforts resulted in the Hospital having to return money to the government, McKay would generally be responsible for 20% of the amount owed by the Hospital.
Entered into evidence was an undated employment contract between Bohl and the Hospital. Bohl was to work as a consultant, and one of his duties was to assist McKay regarding reimbursement of funds from the state or the federal government. Bohl was to be paid $1,200 per week, plus 5% of any past reimbursement adjustments received by the Hospital due to McKay's efforts. Bohl would be responsible for 5% of any amount owed by the Hospital as a result of a reimbursement adjustment suggested by Bohl or McKay.
McKay's review of the 1992 and 1993 cost reports filed by KPMG ultimately yielded additional DSH payment reimbursements of more than $1,300,000 in 1992 and approximately $400,000 in 1993.
Suit was filed against KPMG, LeBlanc and Garrett on June 21, 1995. Trial was held in this matter in November 2001. Judgment was rendered in May of 2002, awarding $439,712.15 to the Hospital for the amount paid to Bohl and McKay pursuant to the contingency fee contracts, and $141,903.55 to the Hospital for loss of use of the funds. KPMG appeals, and the Hospital answers the appeal, seeking an award of attorney fees.

DISCUSSION
Disproportionate Share
At issue is a rule promulgated in 1988 by the Louisiana Department of Health and Hospitals ("DHH"), Division of Medical Assistance, as an emergency rule in the Title XIX Hospital Program. The rule provided, with our emphasis added:
The reimbursement methodology for inpatient hospital services shall incorporate a provision for an additional payment adjustment for hospitals serving a disproportionate share of low income patients (DSH). This provision shall be implemented in the following manner:
1. Qualifying criteria for a Disproportionate Share Hospital:
a. the hospital has at least two obstetricians who have staff privileges ...; or
b. the hospital treats inpatients who are predominantly individuals under 18 years of age; or
c. the hospital did not offer nonemergency obstetric services to the general population as of December 22, 1987; and
d. the hospital has a utilization rate in excess of either of the below-specified minimum utilization rates:
(1) Medicaid Utilization Rate ...; or

*1190 (2) Low-income Utilization Rate ....
2. Payment Adjustments for Disproportionate Share Hospitals
The higher of the below-specified payment adjustment factors shall be applied to the cost limits and then to the total allowable Medicaid inpatient costs for those hospitals qualifying as disproportionate share providers (DSH) as specified above for inpatient hospital services provided on or after July 1, 1988:
a. Medicaid Utilization Ratefor each percentage, or portion thereof, in excess of the Medicaid mean plus one standard deviation, a payment adjustment factor of one percent shall be applied; or
b. Low-income Utilization Ratefor each percentage, or portion thereof, of the low income utilization rate defined above, in excess of 25 percent, a payment adjustment factor of two percent shall be applied; or
c. Medicare DSH rate....
In October of 1990, DHH, Office of the Secretary, Bureau of Health Services Financing, adopted an emergency rule adding an additional requirement of a minimum percentage of free care in order for a hospital to qualify under the low-income utilization methodology. The emergency rule also amended the payment adjustment section to provide:
When a[DSH] hospital qualifies for a payment adjustment based on low-income utilization, the adjustment factor is as follows: For each percentage, or portion thereof, of the low-income utilization rate as defined in II, in excess of 25 percent, a payment adjustment factor of three percent shall be applied.
In January of 1992, DHH, Office of the Secretary, Bureau of Health Services Financing, adopted an emergency rule deleting the 1990 additional free-care requirement for low-income utilization qualification. In addition, this emergency rule provided:
When a [DSH] hospital qualifies for a payment adjustment based on low-income utilization, the payment adjustment factor is as follows: Effective for services November, 1990 and after, a minimum of $1 plus a proportional adjustment equal to the percentage or portion thereof, of the low-income utilization rate as defined in II, in excess of 25 percent times a factor of three.

Prescription
KPMG first argues that the trial court erred in denying KPMG's exception of prescription and its later motion for involuntary dismissal based on prescription. The relevant prescription/peremption period is set forth in La. R.S. 9:5604, which provides, in part:
A. No action for damages against any accountant duly licensed under the laws of this state, or any firm as defined in R.S. 37:71, whether based upon tort, or breach of contract, or otherwise, arising out of an engagement to provide professional accounting service shall be brought unless filed in a court of competent jurisdiction and proper venue within one year from the date of the alleged act, omission, or neglect, or within one year from the date that the alleged act, omission, or neglect is discovered or should have been discovered; however, even as to actions filed within one year from the date of such discovery, in all events such actions shall be filed at the latest within three years from the date of the alleged act, omission, or neglect.
B. The provisions of this Section are remedial and apply to all causes of action without regard to the date when the alleged act, omission, or neglect occurred. However, with respect to any *1191 alleged act, omission, or neglect occurring prior to September 7, 1990, actions must, in all events, be filed in a court of competent jurisdiction and proper venue on or before September 7, 1993, without regard to the date of discovery of the alleged act, omission, or neglect. The one-year and three-year periods of limitation provided in Subsection A of this Section are peremptive periods within the meaning of Civil Code Article 3458 and, in accordance with Civil Code Article 3461, may not be renounced, interrupted, or suspended.
C. Notwithstanding any other law to the contrary, in all actions brought in this state against any accountant duly licensed under the laws of this state, or any firm as defined in R.S. 37:71, whether based on tort or breach of contract or otherwise arising out of an engagement to provide professional accounting service, the prescriptive and peremptive period shall be governed exclusively by this Section and the scope of the accountant's duty to clients and nonclients shall be determined exclusively by applicable Louisiana rules of law, regardless of the domicile of the parties involved.
D. The provisions of this Section shall apply to all persons whether or not infirm or under disability of any kind and including minors and interdicts.
E. The peremptive period provided in Subsection A of this Section shall not apply in cases of fraud, as defined in Civil Code Article 1953.
On July 14, 2000, KPMG filed an exception of prescription based upon La. R.S. 9:5604. The exception was overruled by the trial court. KPMG's application for a supervisory writ was then denied by this court. L.S. Huckabay Memorial Hospital, Inc. v. KPMG, LLP., 35,147-CW (La. App.2d Cir.5/10/01), writ denied, 01-1452 (La.5/31/01), 793 So.2d 170. After the Hospital rested its case during the November 2001 trial on the merits, KPMG motioned for an involuntary dismissal on the basis of prescription. The trial court denied the motion.
When evidence is received on the trial of the peremptory exception, the factual conclusions of the trial court are reviewed by the appellate court under the manifest error-clearly wrong standard as articulated in Stobart v. State Through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Creighton v. Bryant, 34,893 (La.App.2d Cir.6/20/01), 793 So.2d 275.
KPMG asserts that the Hospital had at least constructive knowledge of its cause of action no later than when the Hospital contracted with McKay in May 1994 to review and file amendments to the 1992 and 1993 cost reports.
Constructive knowledge sufficient to commence the running of prescription requires more than a mere apprehension that something might be wrong. Cordova v. Hartford Accident & Indemnity Co., 387 So.2d 574 (La.1980); Creighton v. Bryant, supra. Prescription does not run against one who is ignorant of the facts upon which his cause of action is based, as long as such ignorance is not willful, negligent, or unreasonable. Young v. Clement, 367 So.2d 828 (La.1979); Creighton v. Bryant, supra.
Constructive notice is found at the point at which a plaintiff has sufficient information to excite attention sufficient to prompt further inquiry, and includes knowledge or notice of everything to which that inquiry might lead. K & M Enterprises of Slaughter, Inc. v. Richland Equipment Co., Inc., 96-2292 (La.App. 1st Cir.9/19/97), 700 So.2d 921.
*1192 Proof of a cause of action cannot be equated with knowledge, actual or constructive, as the latter is what governs the date when prescription begins to run. Boyd v. B.B.C. Brown Boveri, Inc., 26,889 (La.App.2d Cir.5/10/95), 656 So.2d 683, writ not considered, 95-2387 (La.12/8/95), 664 So.2d 417.
Betty Bell, an accountant, was the associate administrator of the Hospital at the time the cost reports at issue were prepared. Bell testified that Dr. Huckabay told her that he was setting up a meeting with McKay and Bohl to discuss reviewing the cost reports. She recalled that Dr. Huckabay indicated prior to the meeting that there was the possibility of additional reimbursement from the cost reports.
Dr. Huckabay, Dr. Willis, and Bell met with Bohl and McKay to discuss a proposal to review the 1992 and 1993 cost reports. Dr. Huckabay believed this meeting occurred in March or April of 1994. He recalled that McKay's presentation lasted nearly two hours, and that McKay asked for an opportunity to review the cost reports because he felt he could possibly amend the cost reports and obtain additional reimbursement for the Hospital. After listening to the presentation, Dr. Huckabay was mildly to moderately persuaded that McKay could accomplish this. Dr. Willis believed this meeting occurred prior to May of 1994, and his understanding from the meeting was that McKay was going to review the cost reports in order to pursue money that the Hospital had not received.
Bell did not recall much about the meeting. She remembered McKay and Bohl discussed reviewing the cost reports to determine if there were additional funds that they could recover. She was not optimistic because the Hospital had hired the "best people" to prepare the cost reports, and she thought McKay's efforts would be a waste of her time. Bell communicated her opinion to Dr. Huckabay, who nevertheless said he would like for McKay to review the cost reports. She thought Dr. Huckabay was hopeful that the review would yield additional funds.
McKay testified that he thought the meeting took place in April of 1994. He was certain that he discussed at the meeting the possibility of there being errors or changes in the elections made in the cost reports that could generate additional reimbursement for the Hospital. Although he could not recall exactly what he said at the meeting, McKay felt he mentioned DSH reimbursement because he had to give Dr. Huckabay a reason to hire him to look at the cost reports. He suspected at the time that the calculation of the DSH reimbursement might be an issue, but he did not know for sure until he had access to the relevant documents and could calculate the numbers. McKay stated that even if he had the cost reports prior to the meeting, he would not have reviewed them, but would have looked at them only to glean information so as to make business projections for Bohl.
Bell testified that she spoke with KPMG accountant Jimmy Stapleton, who was performing an audit of the Hospital, about McKay's proposal and the prospect of the Hospital entering into an agreement with McKay. She related that Stapleton told her that since he did not prepare the cost reports, he would first have to speak to someone at his office. Bell recalled that a few days later, Stapleton told her that the cost reports had been filed aggressively and, at best, there would be very little money still available. Stapleton did not remember having these conversations with Bell.
It is unclear when Bohl's contract was signed, although the pre-printed month on the signature section of the contract is *1193 April. The contract with McKay was signed in May of 1994 after the Hospital's attorney, Lewis Sams, reviewed it. Dr. Huckabay testified that he waited four to six weeks after the presentation before signing agreements with Bohl and McKay because he did not have major expectations of McKay's review and because he felt he owed KPMG the respect of notifying them of the proposal.
Dr. Huckabay wrote to LeBlanc on June 1, 1994, to inform him that the Hospital had retained McKay to review the cost reports. Dr. Huckabay requested that KPMG make available to McKay any work papers supporting the amounts on the 1991, 1992 and 1993 cost reports. KPMG responded by letter on July 6, 1994, setting forth the conditions for McKay to be granted access to its work papers. McKay began his review of the 1992 and 1993 cost reports after his contract with the Hospital was executed, but he did not gather most of the necessary work papers and information until after the July letter from KPMG.
McKay informed Bell by transmittal letter dated November 11, 1994, that he had completed his task of amending the 1992 and 1993 cost reports. He wrote that because he had calculated the Hospital's DSH based upon the Low Income Utilization Rate ("LIUR") rather than the Medicaid Utilization Rate ("MUR"), the Hospital would receive additional reimbursement of $1,444,214 for 1992 and $468,979 for 1993. According to Bell, the first time that she became aware that McKay's efforts might result in increased reimbursement was when she received the November 11, 1994, letter and the amended cost reports. It was also the first time that she learned the cost reports were to be amended solely upon the basis of the DSH calculation.
Bell had Dr. Huckabay sign the amended cost reports, and she copied a cover letter dated November 11, 1994, that McKay had previously drafted. She then forwarded the amended cost reports, along with the cover letter, to DHH. Dr. Huckabay testified that he first learned the Hospital would receive additional reimbursement from the 1992 and 1993 cost reports the day before he signed the amended cost reports.
Based upon our review of this record, we conclude that the trial court was not clearly wrong in finding that the Hospital's suit had not prescribed. Prescription did not commence in this matter any earlier than November 11, 1994. Prior to that time, there remained uncertainty in the minds of the Hospital's decision-makers as to whether McKay would recover additional reimbursement.
At the time McKay made his presentation to Bell, Dr. Huckabay, and Dr. Willis, it was not a foregone conclusion that his review would yield money for the Hospital. McKay estimated that 30% to 40% of the time he reviewed cost reports, he did not pursue additional funds under the cost report. Dr. Huckabay felt that he did not want to pay someone by the hour to examine cost reports with which he was satisfied; hence, the contingency fee contracts with Bohl and McKay. We note that the Hospital's contract with McKay provided that if the reimbursement adjustments caused the Hospital to be required to pay any additional funds, McKay would generally be responsible for 20% of these funds. Dr. Huckabay testified that this clause was put in the contract out of concern that McKay's inquiry would lead to the Hospital owing money to the government. For the same reason, a similar provision was placed in Bohl's contract. McKay stated that it is not very often that a hospital has to reimburse money.
It was not unreasonable for the Hospital to await the results of McKay's review before bringing suit. Dr. Huckabay was *1194 not knowledgeable about the rules and regulations surrounding cost reports, nor did he rely on a Hospital employee to know these rules and regulations. Bell, a CPA, began working at the Hospital as the controller in 1981, and became associate administrator in 1992, co-administrator in 1994, and administrator in 1997. Bell testified that for as long as she had been working for the Hospital, a CPA firm had prepared the cost reports because no one at the Hospital was qualified to do them. Bell had some experience in the preparation of cost reports, having assisted in the preparation of the Hospital's cost reports when she was employed as a staff accountant by a CPA firm in the 1970s. However, she claimed that she knew very little about the DSH regulations, and she did not feel that she was qualified to review the filed cost reports for accuracy.
We further note that KPMG was again hired to audit the Hospital's financial statements and prepare cost reports in October of 1994, which would have been approximately five months after Bohl and McKay were retained. The estimated cost for preparing the 1994 cost report was $6,500. The fact that the Hospital continued to contract with KPMG to prepare the cost reports indicates that even after McKay made his presentation and was involved in his review, the Hospital still retained confidence in KPMG's ability to prepare a cost report that would meet the Hospital's expectations. KPMG eventually terminated its relationship with the Hospital.
In support of its argument that the Hospital's action is prescribed, KPMG places much emphasis on Harvey v. Dixie Graphics, Inc., 593 So.2d 351 (La.1992), which involved a suit against an accountant and a vendor for misstating a company's tax liability. Harvey sold HPI to Dixie in 1981, then repurchased it in 1982. Dixie had hired an accounting firm to prepare HPI's income tax return and other financial statements, and Harvey relied on these tax returns and financial statements when repurchasing HPI and later reselling it with warranty. Harvey filed suit on June 15, 1997, alleging that the firm and Dixie had negligently understated HPI's tax liability. The supreme court ruled that the court of appeal was not manifestly wrong in concluding that prescription began running by November 1984 when an IRS agent told Harvey's own accountant and attorney that the tax returns had been prepared incorrectly. At that time, Harvey knew of the negligence, and he had sustained appreciable harm because he had incurred substantial accountant and attorney fees in investigating the deficiencies in the tax return.
The Harvey court recognized that it is not a requirement that the amount of damages be known with certainty before prescription commences. Thus, the commencement of prescription was not delayed until Harvey learned of the amount owed or paid HPI's outstanding taxes after negotiations. The court stated:
The damage suffered must at least be actual and appreciable in qualitythat is, determinable and not merely speculative. But there is no requirement that the quantum of damages be certain or that they be fully incurred, or incurred in some particular quantum, before the plaintiff has a right of action. Thus in cases in which a plaintiff has suffered some but not all of his damages, prescription runs from the date on which he first suffered actual and appreciable damage, even though he may thereafter come to a more precise realization of the damages he has already incurred or incur further damage as a result of the completed tortious act.
Harvey v. Dixie Graphics, 593 So.2d at 354. Citations omitted. However, in the *1195 matter before us, the issue is not when the Hospital learned the amount of the DSH it was owed, but when it first learned whether it was entitled to additional DSH reimbursement above what had been claimed in the cost reports filed by KPMG.
The Hospital did not realize it was owed additional DSH money until McKay finished his analysis of the cost reports prepared by KPMG. This is reflected in the contracts with Bohl and McKay, which held those two individuals liable in the event the review revealed that the Hospital had actually been overpaid. We note that the court in Harvey did not rule that prescription commenced when Harvey learned from his vendee that the IRS was auditing HPI and was proposing adjustments that would result in greater tax liability for Harvey. Similarly, prescription did not commence when McKay made his presentation to the Hospital or when the contracts were signed with Bohl and McKay.
KPMG also urges this court to examine K & M Enterprises of Slaughter, Inc. v. Richland Equipment Co., Inc., 96-2292 (La.App. 1st Cir.9/19/97), 700 So.2d 921. K & M contracted with Richland to repair its tractor. Even after three repair attempts by Richland, the first of which was in March 1992 and the last of which was in June of that year, the tractor still did not work properly, and Richland refused to attempt any additional repairs. A second company attempted unsuccessfully to repair the tractor in August 1994. K & M then took the tractor to a third entity which repaired it in April of 1995. In its February 1996 suit seeking reimbursement for sums paid to Richland and repair costs, K & M alleged that it was not until April 1995 that it learned that Richland's improper repairs had damaged the tractor. The First Circuit agreed with the trial court that prescription started as early as June 1992, with August of 1994 as the latest point in which it could have commenced.
K & M knew something was wrong with the tractor when it took the tractor to Richland for repairs, and K & M also knew that something was still wrong with the tractor after Richland had worked on it. On the other hand, the Hospital would not have known that KMPH had not garnered the maximum reimbursement until McKay could establish it. Up until that point, all the Hospital knew was that it had recovered some DSH reimbursement due to KPMG's cost reports and that McKay was now claiming that he could recover additional funds. This is a far cry from a tractor that was not performing as intended, even after $4,689 had been spent on three repair attempts with defendant.
In support of prescription, KPMG also cites Jones, Walker, Waechter, Poitevent, Carrere and Denegre, L.L.P. v. Homestead Ins. Co., 97-0710 (La.App. 4th Cir.9/10/97), 700 So.2d 233, writ not considered, 97-2975 (La.2/6/98), 709 So.2d 742, and Boyd v. B.B.C. Brown Boveri, Inc., 26,889 (La. App.2d Cir.5/10/95), 656 So.2d 683, writ not considered, 95-2387 (La.12/8/95), 664 So.2d 417.
In Jones, Walker v. Homestead, supra, the Jones, Walker law firm represented Homestead at a trial resulting in an April 1994 judgment against Homestead. On May 11, 1994, Homestead wrote to Jones, Walker that it believed the firm's handling of the case had been compromised by dual representation, and that it would look to the firm for any damages resulting from any act, error or omission. Homestead also informed Jones, Walker that it had terminated the attorney-client relationship and had retained another firm to appeal the judgment, which was affirmed in October of 1995. In September of 1996, Homestead filed a malpractice claim against *1196 Jones, Walker as a reconventional demand in that firm's suit against Homestead to recover unpaid fees and costs. The court ruled that Homestead's action prescribed in May 1995 because at the time of the May 1994 letter, Homestead was aware of Jones, Walker's alleged wrongful conduct and that it had incurred appreciable damages, including the appeal expenses.
In Boyd v. Boveri, supra, Boyd filed suit in March 1988 alleging that he suffered injury when exposed to toxic chemicals. He was ordered in April 1989 to provide medical proof of his exposure to toxic chemicals and of the injuries he sustained. On advice of his counsel, Boyd filed a motion to dismiss in January 1990, and his claim was dismissed with prejudice. In July 1991, Boyd was diagnosed with cancer. Later that year, Boyd retained new counsel, who told Boyd that he needed a medical expert who could substantiate the connection between the toxic exposure and his cancer. After learning in December 1992 that a physician had concluded that he had suffered his illness due to the toxic exposure, Boyd filed suit on April 22, 1993, making essentially the same allegations against essentially the same defendants as in the prior suit. This court concluded that, at the latest, Boyd had constructive knowledge of his cause of action when he was diagnosed with cancer in July of 1991.
The Jones, Walker and Boyd cases can be readily distinguished. Homestead was aware of the Jones, Walker firm's allegedly harmful conduct when it accused the firm of compromising its handling of the unsuccessful trial. Boyd thought he had a cause of action when he filed his first suit, which he dismissed due to lack of proof. Boyd was aware that he was injured after being diagnosed with cancer, but he was still unable to establish causation at that time. In contrast, the Hospital was unaware that KPMG had not acquired maximum reimbursement until McKay completed his review. Because the Hospital was not aware it was injured until McKay completed his review, it was reasonable for the Hospital to await the results of McKay's review.
For the reasons cited above, the trial court correctly denied KPMG's exception of prescription and motion for involuntary dismissal based upon prescription.
Liability
KPMG next contends that the trial court erred in finding KPMG to be negligent while simultaneously finding that KPMG's conduct did not fall below the standard of care. KPMG also points out that the Hospital was unable to establish the standard of care expected of accountants practicing in its locality.
Establishing the requisite standard of care is one of the elements of proving negligence. In order to prevail on a claim of negligence under La. C.C. art. 2315, a plaintiff must establish that: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard of care (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) actual damages (the damages element). Mathieu v. Imperial Toy Corp., 94-0952 (La.11/30/94), 646 So.2d 318; Jackson v. Scott Truck and Tractor, Inc., 31,933 (La. App.2d Cir.5/5/99), 736 So.2d 897.
However, the Hospital also alleged breach of contract in its petition, and it recovered damages under its contract *1197 claim. In its oral reasons for judgment, the trial court stated, in part:
... The theories of liability advanced by Mr. Bethard, there were three. Negligence, deviation below the standard of care and contract. I take out the second one, the standard of care first and deal with it. I found that Mr. Williams on cross-examination did an excellent job of casting doubt on that theory of liability, as did Mr. Odom in his closing argument. So as to that standard-of-care deviation, I find for the defendant. However, as to the negligence theory, and as to the contract theory, I find for the plaintiff. I believe that the plaintiff did carry his burden of proof, on either one or both of those theories of liability....
KPMG does not address the breach of contract issue in its original brief to this court. It is addressed in KPMG's reply brief, in which KPMG argues that the Hospital made no effort to support its breach of contract claim and that KPMG could not have breached its contract if it met the standard of care.
It is of no significance that in pleading breach of contract, the Hospital alleged breach of contract based upon KPMG providing services below the standard of care, as this court has stated:
Louisiana has abandoned any necessity to plead a theory of the case in favor of fact pleading, where it is not necessary to plead the theory of a case in a petition. La. C.C.P. art. 862; Kizer v. Lilly, 471 So.2d 716, 719 (La.1985); Perkins v. Scaffolding Rental & Erection, 568 So.2d 549 (La.1990). As long as the facts constituting a claim are alleged, the party may be granted any relief to which he is entitled under the pleadings and the evidence. The "theory of the case" doctrine has been abolished. Martin v. Bigner, 27,694 (La.App.2d Cir.12/6/95), 665 So.2d 709; First South Prod. Cr. v. Georgia-Pacific, 585 So.2d 545 (La.1991).
Hailey v. Hickingbottom, 30,728 (La. App.2d Cir.6/24/98), 715 So.2d 647, 649.
Among the facts pled by the Hospital in its petition were that it had contracted with KPMG for the preparation of the cost reports, and that the method chosen by KPMG in preparing the cost reports resulted in the Hospital receiving less from DHH than if KPMG had used another method.
When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046. Only when the agreement is unclear, ambiguous, or will lead to absurd consequences, should a court go beyond the written agreement to gather the parties' true intentions. State Dept. of Transp. and Development v. Unknown Owners, 27,150 (La.App.2d Cir.9/27/95), 661 So.2d 626, writ denied, 95-2497 (La.12/15/95), 664 So.2d 459.
Whether a contract is ambiguous or not is a question of law. NAB Natural Resources, L.L.C. v. Willamette Industries, Inc., 28,555 (La.App.2d Cir.8/21/96), 679 So.2d 477. In the case of ambiguity in a contract, where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown. However, when appellate review is not premised upon any factual findings made at the trial level, but instead is based upon an independent review and examination of the contract on its face, the manifest error rule does not apply. In such cases, appellate review of questions of law is simply whether the trial court was legally correct or legally incorrect. Lawrence v. Terral Seed, Inc., 35,019 (La.App.2d *1198 Cir.9/26/01), 796 So.2d 115, writ denied, 01-3134 (La.2/1/02), 808 So.2d 341; Spohrer v. Spohrer, 610 So.2d 849 (La.App. 1st Cir.1992).
The contracts at issue, as reflected in the 1992 and 1993 engagement letters, in no way limited KPMG to preparing cost reports that would recover only some of the DSH money available for reimbursement. Moreover, there is certainly no indication that the Hospital did not expect KPMG to seek maximum DSH reimbursement or payments.
Durham recalled meeting with Dr. Huckabay and Garrett prior to KPMG contracting with the Hospital. She testified that she told Garrett that Dr. Huckabay wanted to maximize the reimbursement that the Hospital would receive from the cost reports. Durham thought the note from KPMG that it was prepared to amend the 1991 cost report to recover the maximum reimbursement meant KPMG understood that the agreement was for KPMG to get the most reimbursement that it could legally recover.
Dr. Huckabay testified that KPMG was hired because it was nationally rated, was respected, and had been recommended by Durham. Dr. Huckabay met with Garrett and LeBlanc before retaining KPMG, and he felt sure that he advised them that the Hospital was interested in maximizing its reimbursement. His understanding was that KPMG would maximize the return from the cost reports. Dr. Huckabay stated that he would not have hired someone to do the cost reports if he felt that person was not going to seek the greatest possible reimbursement.
J. Mark Garrett, a partner in KPMG, testified that KPMG prepared the engagement letters and estimated the fees. He could not recall any negotiations over the fees, except when Dr. Huckabay declined an audit of a 1991 balance sheet by drawing a line through the estimated fee. KPMG also billed for additional time it spent preparing the cost reports, as evidenced by the statement faxed to Durham.
Bell provided the financial documents to the accountant or firm engaged to prepare the cost reports. She testified that she expected KPMG to prepare cost reports that maximized reimbursement for the Hospital, and she would not have been in favor of hiring KPMG if it was not going to do this.
David Centafont, who testified as an expert in the preparation of cost reports, stated that it is the responsibility of a cost report preparer to follow all available avenues that will increase the reimbursement to which a facility is entitled under the law. Centafont thought that a cost report preparer has a duty to obtain the maximum legitimate reimbursement.
It would be absurd to suggest that the Hospital contracted with KPMG to recover some money, but not the maximum amount available. KPMG obviously knew that the Hospital desired the maximum recovery, as is shown by KPMG's suggestion to amend the 1991 cost report.
Tom Turnbow was the staff accountant at KPMG who prepared the 1992 and 1993 cost reports. He was in charge of gathering the work papers and doing the actual calculations, prior to review by a reimbursement specialist. Suggestions made by the reimbursement specialist were incorporated into the 1993 cost report. Turnbow's only prior experience preparing cost reports was with another client hospital in 1990 and 1991, but he did not perform the DSH calculation in those instances. The Hospital's cost reports were the first time he had ever done a calculation for Medicaid DSH. Turnbow also amended the 1991 cost report which had been prepared by a different accounting firm.
*1199 When calculating the DSH, Turnbow relied on a fact sheet he received from DHH, as well as what he learned from conversations with representatives from DHH. He and a DHH representative worked through just one method of calculating DSH, the Medicaid Utilization Rate ("MUR"). Turnbow used the MUR payment adjustment factor to calculate the DSH for both years because the Hospital qualified under the MUR, as opposed to qualifying under the Low Income Utilization Rate ("LIUR"). Turnbow did not perform any other calculations, as he did not believe that the MUR payment adjustment factor could be used if a hospital qualified under LIUR, or vice versa. In Turnbow's opinion, while there are three payment adjustment factors, they may not apply to both methods of qualifying.
At the time of trial, McKay was an inactive CPA working as a health care consultant assisting hospitals with reimbursement. When amending the cost reports, he used the LIUR payment adjustment factor to determine the DSH reimbursement for both years. He calculated that in 1992 the LIUR for the Hospital was 64.19%, which exceeded the 25% threshold to qualify under the LIUR method. He concluded that the DSH adjustment for the Hospital in 1992 was $1,652,940. In 1993, he calculated that the LIUR was 51.66%, again over the 25% threshold, and that the DSH adjustment for the Hospital was $507,393. McKay stated that he used the LIUR method because it resulted in a higher DSH reimbursement to the Hospital. McKay testified that once the final settlements were made by DHH, he had recovered additional DSH payments to the Hospital in excess of $1,700,000.
Mike Keefe testified on behalf of KPMG as an expert in general accounting. Keefe is a CPA with Deloitte and Touche, serving as an audit partner specializing in the audit of public companies and hospitals, as lead client service partner, and as professional practice director. Keefe had not assisted in the preparation of a cost report since the late 1970s, and he did not consider himself to be a reimbursement specialist, although he believed he possessed a general understanding of the Louisiana rules regarding Medicaid DSH. Keefe opined that accounting standards do not require that an accountant bring all the nuances of Medicaid regulations to the attention of the client hospital when compiling cost reports; the accountant simply takes information provided by the client and puts in the proper classification on a form. It was noted that Louisiana does not require any license or certificate in order to prepare cost reports.
Keefe testified that assuming his firm would have had the same information that was available to McKay, then it would have used the LIUR formula when preparing the original 1992 and 1993 cost reports. Keefe stated that most clients expect his firm, when preparing cost reports, to recover the maximum allowed reimbursement to which they are entitled based upon the information provided.
After reviewing the two engagement letters, Keefe stated that the amount of the estimated fees ($4,000 and $6,000) for preparing the cost reports indicated to him that KPMG was going to take the information provided by the hospital and prepare the cost report without searching for anything that could maximize reimbursement. Keefe distinguished this type of engagement from an engagement to maximize reimbursement. However, we note that in this instance, KPMG would not have had to go out and search for angles to maximize reimbursement, as all KPMG had to do was to use the LIUR payment adjustment factor instead of the MUR payment adjustment *1200 factor. Also, when Keefe was presented with the March 16, 1993, fax showing an $8,000 charge for additional research and consultation on the cost report and a solicitation to file an amended 1991 cost report "to get as much as possible in reimbursement," Keefe allowed that that "could be" the type of consulting agreement in which an accounting firm endeavors to obtain maximum reimbursement.
There was never any question that KPMG prepared accurate 1992 and 1993 cost reports. This is obvious in the fact that DHH began making reimbursement payments in accordance with the claimed amounts. Nevertheless, accuracy is not to be confused with adequacy. The Hospital contracted with KPMG to seek the maximum DSH reimbursement based upon the information provided. KPMG failed to do this, and as such, breached its contract with the Hospital. Accordingly, we do not find error in the trial court's finding of breach of contract as a basis of liability.

Damages
KPMG argues in its final assignments of error that the trial court erred in awarding damages for loss of use of funds when plaintiff failed to introduce evidence establishing the value of this loss. The Hospital relied on two charts prepared by Bell which show the loss of funds on the actual and projected dates of payment, but which do not show the value of this loss.
Bell explained that normally a hospital obtains 50% of its reimbursement when the state receives the cost report, around 30% at a later date, and then the remainder at final settlement, which is when DHH has finished its audit. Bell testified regarding her calculations of the lost funds and for the length of time that the Hospital was without these funds. The loss of use was calculated by subtracting actual payments from amounts that would have been paid if the amended cost reports had been filed in place of the original cost reports. For instance, on March 16, 1993, the Hospital received $416,407 from the state, which represented 50% of the claimed adjustment on the original 1992 cost report. Bell stated that if the amended cost report had been filed instead at that time, the Hospital would have received $1,048,079 on March 16, 1993, which meant the Hospital was deprived of the use of $631,672 at the time. Bell agreed that one could not tell the value of the loss of use of these funds from the two exhibits that she had prepared on this issue.
Counsel for the Hospital attempted to establish the value of the loss by arguing to the court after both parties had rested:
There is also the issue of loss of use of funds. Exhibits 105 and 106 have been introduced into evidence to assist the Court, if the Court is of a mind to grant those damages, to show the period of time that the hospital was without those funds. In fact, attached to the Betty Bell affidavit attached to the Motion for Summary Judgment, there is another schedule that actually calculates the legal interest, because the legal interest changes from time to time. It actually calculates the legal interest up to whatever date it was on the Exhibit that is attached to the Motion for Summary Judgment. So we feel that there is a loss of use of funds. Civil Code Article 1995 says "Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived." So we feel that that Civil Code article covers both the amount paid to McKay and Bohl, and also the loss of the use of the funds.
Exhibits 105 and 106 were the two charts prepared by Bell.
*1201 In Bell's affidavit referenced by the Hospital's counsel at trial, she states that she used the rate of judicial interest to value the loss of the use of the funds. However, this affidavit was not introduced into evidence at trial, and was not to be considered by the trial court. It is of no significance that the affidavit is attached to a motion for summary judgment that is physically part of the record. Evidence not properly and officially offered and introduced into evidence cannot be considered, even if it is physically placed in the record. Touzet v. Mobley, 612 So.2d 890 (La.App. 5th Cir.1993), writ denied, 614 So.2d 1263 (La.1993).
The trial court apparently did not rely on the affidavit in awarding damages. Following the close of evidence, the trial court requested that the parties file post-trial memoranda on whether it could award damages for loss of use "in the absence of evidence from reliable sources" as to how it was to be calculated. Nevertheless, the trial court still used the rate of judicial interest to calculate the damages. In its December 2001 ruling on damages, the trial court stated that it found La. C.C. art. 2000 to be especially relevant.
The trial court was in error in placing reliance on La. C.C. art. 2000, as that article provides for legal interest as a measure of damages when the object of the performance is a sum of money, which is not the case in this matter. KPMG correctly argues that the rate of judicial interest is generally used to bring a damage award up to present value, not to determine the damage amount as the Hospital is attempting to do in this matter. Therefore, we conclude that the trial court erred in awarding the sum of $141,903.55 for loss of use of funds without evidence establishing the value of the loss.

Attorney Fees
The Hospital answers the appeal urging that the trial court erred in denying its claim for attorney fees. A party shall recover attorney fees only when authorized by statute or stipulated by contract. Bossier Orthopaedic Clinic v. Durham, 32,543 (La.App.2d Cir.12/15/99), 747 So.2d 731. The Hospital does not contend that attorney fees are either authorized by statute or stipulated by contract. Rather, the Hospital cites a legal malpractice action, Ramp v. St. Paul Fire & Marine Ins. Co., 263 La. 774, 269 So.2d 239 (La.1972), in support of its argument. However, there is a distinction between recovering attorney fees incurred for curative work, and recovering attorney fees incurred pursuing a malpractice action, as this court has explained:
This is consistent with Ramp, where the attorney fee awarded was not for pursuit of the malpractice suit, but was for the additional fee incurred by the plaintiff to pursue certain inheritance rights which the negligent attorneys had failed to protect.
Jenkins v. St. Paul Fire & Marine Insurance Company, 393 So.2d 851 (La.App. 2d Cir.1981). See also, Henderson v. Domingue, 626 So.2d 555 (La.App. 3rd Cir. 1993), writ denied, 93-2976 (La.1/28/94), 630 So.2d 799.
The Hospital has already recovered the fees (albeit not attorney fees) associated with the curative work: the $439,712.15 paid to Bohl and McKay to file the amended cost reports. The trial court did not err in denying an award of attorney fees.

CONCLUSION
We amend the judgment to delete the award of $141,903.55 for loss of use of funds. As amended, the judgment is affirmed.

*1202 DECREE
As AMENDED, the judgment is AFFIRMED at appellants' costs.